MAGUIRE INDUSTRIES, INCORPORATED, PETITIONER, *v.* SECRETARY OF WAR, RESPONDENT.

Docket No. 225–R.   Promulgated January 27, 1949.

*Eugene Daniel Powers, Esq., Henry Epstein, Esq.,* and *James Grossman, Esq.,* for the petitioner.
*Julian R. Wilheim, Esq.,* and *J. F. Wolf, Esq.,* for the respondent.

OPINION.

OPPER, *Judge*: Both parties insist that the Tax Court has jurisdiction of this proceeding to redetermine petitioner's excessive profits.

But the subject is not one upon which the agreement of the litigants can be binding, and the question must be examined on our own initiative even though passed over by the parties, *Martha M. Hanify*, 21 B. T. A. 379, or answered by them in the affirmative. *Mohawk Glove Corporation*, 2 B. T. A. 1247; *D. L. Blackstone*, 12 B. T. A. 456.

The situation is unusual. While the original Renegotiation Act of April 28, 1942, was in effect, the parties entered into an agreement purporting to deal with petitioner's profits for its fiscal year ended October 31, 1942. In the contract the parties agreed that, as of the day of its execution, but for the fiscal year which had not yet ended, petitioner had excessive profits of $6,000,000. The difficulty arises because of an additional provision reciting the anticipated results of operations for the remainder of the fiscal year, and permitting respondent "To reopen the renegotiation in his discretion   *   *   *   if the result of actual operations from May 1, 1942, to October 31, 1942, were substantially at variance with the [attached] estimates for said period upon which said finding [of excessive profit] is based   *   *   *   but such negotiation shall relate only to such variance, if any   *   *   *" After the close of the fiscal year and upon being supplied with the figures of actual operations, respondent, on the basis of the information so furnished, notified petitioner that a substantial variance existed as provided in the agreement, and subsequently "determined" that petitioner had "additional" excessive profits "for the period May 1, 1942, to October 31, 1942," of $750,000.

Although, as we have said, the parties concur in their conclusion that jurisdiction exists here to deal with the present question, the impact of their arguments on the merits reveals a fundamental divergence in their view as to the scope of that jurisdiction. Each insists that we have no jurisdiction to take the action for which the opposing party calls upon us. We agree with each. Taken together, the respective contentions seem to us to confirm that in fact the statutory scheme applied to the present circumstances renders this proceeding so inappropriate for a resolution of the true issue as to invoke the gravest doubt of any legislative anticipation that such a dispute could be proper for our consideration.

Petitioner, for example, contends that:

Here, where the unilateral determination takes additional excessive profits from the half year, and the agreement takes some excessive profits from the whole year, the Court must redetermine all the excessive profits thus inextricably intermingled in these two overlapping determinations, and if the Respondent has taken more excessive profits for the entire year than should have been taken from Petitioner under the Act, the Court must grant full relief for the year   *   *   *

But even if the unilateral determination is considered as necessitating a redetermination in terms of the second half year, it is still necessary for the

Court, in arriving at a determination de novo, to treat as the amount of excessive profits recaptured all sums taken on account of the second half year, and not merely the $750,000. To do this there must be an allocation of some part of the $6,000,000 to the second half year.

Respondent, on the other hand, while agreeing with petitioner that "the expressed purpose of that agreement was to adjust petitioner's profits realized or likely to be realized on its Government contracts from June, 1939, through October 31, 1942," adds to that purpose that it was "to make a final determination of such profits subject to one very narrow proviso." He insists that "it is implicit in the statutory language that the Tax Court is limited, in the scope of its redeterminations of the amount of excessive profits, to the period or the method used by the Secretary in making his prior determination of such profits." He adds that:

The Secretary of War was fully empowered to renegotiate petitioner in the manner in which he acted, that is, by bilateral agreement and the subsequent issuance of a unilateral determination, relating only to the variance between petitioner's estimated and actual results of its operations for the period from May 1, 1942, through October 31, 1942, in accordance with the specific provisions of that Agreement, and also with the 1942 Renegotiation Act, as amended. His action was purely a matter of administrative policy over which this Court often has held that it has no jurisdiction * * * For this Court now to disregard the basis from which that determination of excessive profits was predicated would be to fly in the very teeth of the statute and the existing bilateral agreement between petitioner and the War Department. All that the Court can do in this proceeding is to act within the scope of the pertinent provisions *of the statute and the Agreement*, as respondent necessarily has done, and restrict itself to making a redetermination of the excessive profits, reflected in the variance between petitioner's estimated and actual results of its operations for the last six months of its fiscal year 1942 * * *

We think it manifest that the positions so taken are not only in hopeless conflict with each other, but that each is a description of our jurisdiction fatally inconsistent with the statute. It is section 403 (e) of the Renegotiation Act, as added by section 701 of the Revenue Act of 1943, which confers upon the Tax Court such jurisdiction as it possesses in redeterminations of excessive profits. Subsection (1), covering only determinations by the Board, is patently irrelevant. The following language of subsection (2) could alone be presently applicable:

(2) Any contractor or subcontractor * * * aggrieved by a determination of the Secretary made prior to the date of the enactment of the Revenue Act of 1943, with respect to a fiscal year ending before July 1, 1943, as to the existence of excessive profits, which is not embodied in an agreement with the contractor or subcontractor, may * * * file a petition with The Tax Court of the United States for a redetermination thereof * * *

Respondent made and purported to make no determination with respect to any fiscal year. Nor in fact did he determine profits with

respect to any contract or group of contracts as was permitted under the prior legislation. This is not such a case as *Psaty & Fuhrman, Inc.*, 11 T. C. 638, where the determination was with respect to a full fiscal year, although it included profits overlapping into a subsequent year. No provision of the section we have quoted, nor of any other legislation to which we have been directed, confers upon the Tax Court jurisdiction to redetermine excessive profits limited to only a part of the business of only a part of a fiscal year. Unless we can accept petitioner's suggestion that respondent's determination was one dealing with the entire year, even though not so framed, the statutory authorization for the Tax Court to intervene seems to us to be absent and, of course, such jurisdiction must be expressly conferred to exist at all. *Superheater Co.* v. *Commissioner* (C. C. A., 2d Cir.), 125 Fed. (2d) 514.

That the assumption so required is inadmissible seems to us to follow not only from the express and unambiguous declaration of the determination itself, but from the further circumstance that under the contract respondent's option to "reopen the renegotiation" is explicitly confined by the subsequent language "but such negotiation shall relate only to such variance." And the variance is limited to that between the estimates and the ultimate figures for the period May 1 to October 31, 1942. Such a determination as petitioner describes would be outside the power of respondent under the only contract under which his action was authorized. And that the parties themselves anticipated a resort to the contract and not to the statute for the resolution of any uncertainty as to their respective undertakings is demonstrated by the parties' agreement that the contract should "remain in full force and effect notwithstanding any interpretation, amendment or disposition of" the Renegotiation Act then in effect. To view respondent's action as a determination of excessive profits for any fiscal year would hence fly in the face, not only of the contract of the parties, but also of the provision in the October 21, 1942, amendment to the original Renegotiation Act, which commands that "Any such agreement shall be final and conclusive according to its terms; and * * * such agreement shall not be reopened as to the matters agreed upon, and shall not be modified by any officer, employee, or agent of the United States." Sec. 403 (c) (4). The authorization given us to review a determination for any fiscal year is accordingly inadequate to cover the present situation.

In sum, if, as petitioner insists, respondent by his conduct reopened the entire agreement, including what was finally and irrevocably settled by it, his action would appear to have been invalid as not in accordance with the law, which commands that "such agreement shall not be reopened as to the matters agreed upon." No redetermination predicated on such an action could have been envisaged by the law-

makers. On the other hand, if, as respondent puts it, "all that respondent * * * could do and did do was negotiate with petitioner regarding the adjustment of such variance only * * * ," then, however much respondent's action may be sanctioned by the contract, we agree with petitioner when it says: "There is no basis in the statute for such a redetermination."[1] There is still less statutory justification for our jurisdiction to review it. And to take a third course advocated by neither party and attempt to apply some approach invented *ad hoc* by ourselves in an effort to reconcile the contradictory procedural assertions of the parties would appear to have even less warrant in the statute, and to be an equally unauthorized effort to apply an equitable device beyond the scope of the limited jurisdiction of the Tax Court. *Commissioner* v. *Gooch Milling & Elevator Co.*, 320 U. S. 418.

That it was not intended to include in the scope of our review matters arising collateral to contractual settlements seems to us further fortified by comparison of the several methods of disposition envisaged by the various versions of the renegotiation statute. The act[2] refers to "such final *or other* agreements," expressly authorizes them to "cover such *past* and *future* period," and anticipates that they will contain "such terms and conditions, as the Secretary deems advisable." (Emphasis added.) As if in order to eliminate any doubt as to the possibility of review of acts performed in effectuation of the agreements so broadly permitted, there is the further exhortation that "such agreement and any determination made in accordance therewith shall not be annulled, modified, set aside, or disregarded in any suit, action, or proceeding." Section 403 (c) (4), Renegotiation Act, as retroactively amended by Act of October 21, 1942.

When the Revenue Act of 1943, which for the first time conferred jurisdiction upon the Tax Court to redetermine excessive profits, was under consideration, it originally contained a provision permitting review of prior determinations "whether or not such determination is embodied in an agreement with the Contractor or subcontractor." It was with reference to this version of the pending legislation that the comment was made on the floor of the House, as referred to in *Psaty & Fuhrman, Inc., supra*, that "fairness compels us to give this right to all contractors notwithstanding that many have signed closing agreements," and that the legislation was intended to apply to "any contractor aggrieved by a determination of excessive profits under the old law, whether he was cooperative and signed a closing agreement or not * * *"

---

[1] "* * * We can find in the statute authority for the Secretary to renegotiate contracts singly or in groups or to renegotiate by periods, (1942 Act as amended, 403 (c) (1) second sentence, and 403 (c) (4), second sentence). But there is no authority to renegotiate only a part of the sales under a contract or contracts for only a part of a fiscal period. * * *" (Petitioner's reply brief.)

[2] As retroactively amended Oct. 21, 1942.

But the proposal in question, although reported favorably by the Senate Finance Committee, was amended in the Senate to reach an almost diametrically opposite result, and the latter version was accepted in conference and became law. The conference report describes the action as follows:

Under the House bill, any contractor or subcontractor * * * aggrieved by a determination of the Secretary made prior to the date of the enactment of the bill with respect to a fiscal year ending before July 1, 1943, as to the existence of excessive profits, is entitled to a court review of such determination, whether or not he has agreed to it. The [Senate] amendment limits the review of such determinations to those which have not been agreed to by the contractor or subcontractor. The House recedes. [House Rept. No. 1079, 78th Cong., 2d sess., p. 84.]

It thus appears that in its ultimate form the final version of the Renegotiation Act and the incorporated provisions dealing with Tax Court jurisdiction carried through the recognition of the finality of renegotiation settlements developed through the medium of bilateral agreement. The intention seems to us equally evident to supply, by means of resort to the Tax Court, a procedure not theretofore in existence, to review in some forum unilateral determinations of administrative officers made purely under authority of the statute.[3] But that it was concerned with a new procedure for handling disputes growing out of contractual relationships or the interpretation and enforcement of bilateral agreements nowhere appears.

There are other fora in which contracts between the United States and private persons may be interpreted and enforced. See *Lord Manufacturing Co.* v. *Stimson* (Dist. Ct., D. C.), 73 Fed. Supp. 984. In any such litigation between the present parties, the issue would be, as it is here, not whether in fact for any period or by any standard the profits were excessive, but whether respondent's revision of the contractual amount to accord with the "variance" in the figures was an effectuation or a violation of the agreement. "But in any event," to quote again from petitioner's reply brief:

* * * it is not this Court's function to act as an arbiter under the August 7, 1942 agreement or to ascertain whether the taking of the additional $750,000 achieves the objective of the agreement.

If respondent's determination was "made in accordance" with the agreement, the statute itself forbids its modification or disregard. If it was not, we may assume, without passing upon the question, that in litigation instituted by either party it can be modified to effectuate the engagements so undertaken. But in neither event can it be considered such a unilateral determination of excessive profit, torn from

---

[3] "Under the Renegotiation Act of 1942 no right of appeal or review for redetermination of the excessive profits determined by the Secretary was provided. This was a source of considerable complaint from contractors and subcontractors whose contracts fell within the purview of that Act." *Psaty & Fuhrman, Inc., supra.*

its contractual accompaniment, nor for such a period relating to petitioner's fiscal year, as to persuade us that it was intended to be encompassed within the redeterminations upon which we are authorized to pass.   An order will be entered that this proceeding be

*Dismissed for lack of jurisdiction.*

Reviewed by the Court.

ARUNDELL, *J.*, dissents.

———

DISNEY, *J.*, dissenting: I can not agree that we do not have jurisdiction in this matter.   Of course, the fact that neither party raised the point does not preclude our doing so, but I think the majority opinion incorrectly finds lack of jurisdiction.   Section 403 (a) of the Renegotiation Act provides, in pertinent part, that a contractor or subcontractor aggrieved by a determination of the Secretary with respect to a fiscal year as to the existence of excessive profits, which is not embodied in an agreement, may file his petition with this Court.

First, the majority opinion, both in headnote and in body of the opinion, seems to base its conclusion upon the fact that the order was not with respect to a fiscal period, but only to a part of the business of a part of a fiscal year.   I can not believe that the intent of the statute is to preclude jurisdiction on such grounds.   The mention of fiscal year in the statute has reference only to whether the period involved is before or after July 1, 1943, or the enactment of the Revenue Act of 1943.   I would not refuse jurisdiction on so narrow a ground.

Second, it seems to me that, in strict line with the language of section 403 (e) (2), we have here a matter of excessive profits "not embodied in an agreement with the contractor" because the agreement of August 7, 1942, between the petitioner and the respondent specifically permitted reopening of the renegotiations if the result of actual operations from May 1 to October 31, 1942, was substantially at variance with the estimates made for such period, with provision that such negotiation should relate only to such variance.   The facts found show that the estimated result, that is, profit, was only $1,210,-242.13, whereas the actual result in profit might have been as great as $2,025,984.   The respondent, therefore, in strict conformity with the contract, reopened the negotiation as to the variance.   It seems to me that in order to arrive at jurisdiction we need only to determine the fact that there was a difference between estimate and result, that the contract plainly provided therefor, and that the respondent, accordingly, reopened the matter to the limited extent provided in the contract.   It is our power and duty to decide such facts.   I note that the conference report on the bill, as quoted in the majority report, refers

to the Senate amendment as limiting review of determinations "to those which have not been agreed to by the contractor  *  *  * " The review here at hand, being specifically and carefully excluded from the agreement, was, it seems to me, intended by Congress to have our consideration. In my opinion, decision of this matter comes well within the ambit of the task which Congress assigned to us, and I do not think that body intended to leave it to other courts, as the majority opinion does. Rather obviously, Congress did not wish the matter of renegotiation to be cognizable by the courts in general, and a case to come under the jurisdiction of such courts would, as I see it, require a much stronger showing than appears here. In my view, we should exercise jurisdiction and decide the case.

VAN FOSSAN and BLACK, *JJ.*, agree with this dissent.