MAURICE W. HARNEY, GEORGE E. MURPHY, HARRY B. MURPHY, SPAR MANUFACTURERS, AND HARNEY-MURPHY SUPPLY COMPANY, PETITIONERS, *v.* EMORY S. LAND, CHAIRMAN OF THE UNITED STATES MARITIME COMMISSION, RESPONDENT.

Docket Nos. 183–R, 548–R.   Promulgated April 21, 1950.

*Stanley Suydam, Esq.*, and *John Dahlgren, Esq.*, for petitioners.
*Frederick N. Curley, Esq.*, *Harland F. Leathers, Esq.*, and *James D. Lynch, Esq.*, for respondents.

OPINION.

HILL, *Judge*: *Issue 1.*—Petitioners contend that the renegotiation proceedings involved "were not begun in the form or manner nor within the time provided * * *" by the Renegotiation Acts of 1942 and 1943.

With respect to 1942 petitioners argue that the commencement of the proceeding is governed by section 403 (c) (5) of the Renegotiation Act of 1942.[1] That is not correct. Section 403 (c) (5) is applicable

---

[1] [Sec. 403 (c)] (5) Any contractor or subcontractor who holds contracts or subcontracts, to which the provisions of this section are applicable, may file with the Secretaries of all the Departments concerned statements of actual costs of production and such other financial statements for any prior fiscal year or years of such contractor or subcontractor, in such form and detail, as the Secretaries shall prescribe by joint regulation. Within one year after the filing of such statements, or within such shorter period as may be prescribed by such joint regulation, the Secretary of a Department may give the contractor or subcontractor written notice, in form and manner to be prescribed in such joint regulation, that the Secretary is of the opinion that the profits realized from some or all of such contracts or subcontracts may be excessive, and fixing a date and place for an initial conference to be held within sixty days thereafter. If such notice is not given and renegotiation commenced by the Secretary within such sixty days the contractor or subcontractor shall not thereafter be required to renegotiate to eliminate excessive profits realized from any such contract or subcontract during such fiscal year or years and any liabilities of the contractor or subcontractor for excessive profits realized during such period shall be thereby discharged.

when the proceeding is initiated by the contractor by voluntarily filing information with the Secretary. The contractors here did not voluntarily file any information with the Secretary relative to 1942. On the contrary, the Secretary [2] initiated the 1942 proceeding, so we must consult section 403 (c) (6) of the Renegotiation Act of 1942 [3] in solving any problems relating to the form or manner of the commencement of such proceeding. *Spray Cotton Mills*, 9 T. C. 824.

Concerning both the fiscal years 1942 and 1943 the petitioners contend that there has been no compliance with the applicable statutes, since the notices sent to them were mailed to "Spar Manufacturers" and to "Harney-Murphy Supply Company." They state that "the law applicable to service of notice in this instance is the law of the State of Washington," and that under that law:

Service of notice on the partnership could not legally be effected except by mailing the required notices by registered mail, to such of the partners and each of the partners from whom the Maritime Commission desired to attempt to recover excess profits. * * *

Petitioners cite no authority for their statement, nor have we been able to find any. First of all, there is no requirement in the section of the act applicable that the notice should have been sent by registered mail. In *Spray Cotton Mills, supra*, p. 833, we stated that section 403 (c) (6) "contains no directions for the Secretary concerning formalities to be observed by him or the manner in which the proceeding shall be commenced and carried to final determination." It would seem clear that, if Congress had intended that state law should govern in respect of the proper parties to whom notice should be mailed, it would have so provided.

It is apparent, moreover, that here the proper parties were notified of the commencement of this proceeding, for communications with respect to petitioners' fiscal years 1942 and 1943 were directed at various times to Spar Manufacturers and Harney-Murphy Supply Co., both of whom were "contractors" within the meaning of the statute. See section 403 (a) (5) (ii) (B) of the Renegotiation Act of 1942. See *Moening v. War Contracts Price Adjustment Board*, 14 T. C. 589.

Petitioners next argue that none of the communications discussed in

[2] Section 403 (a) (2) of the Renegotiation Act of 1942 states as follows concerning the term "Secretary":

"(2) In the case of the Maritime Commission, the term 'Secretary' means the Chairman of such Commission * * *."

See also section 403 (a) (2) of the Renegotiation Act of 1943.

[3] [Sec. 403 (c)] (6) This subsection (c) shall be applicable to all contracts or subcontracts hereafter made and to all contracts and subcontracts heretofore made, whether or not such contracts or subcontracts contain a renegotiation or recapture clause, unless

* * * * * * *

No renegotiation of the contract price pursuant to any provision therefor, or otherwise, shall be commenced by the Secretary more than one year after the close of the fiscal year of the contractor or subcontractor within which completion or termination of the contract or subcontract, as determined by the Secretary, occurs.

our findings constituted a proper commencement of the proceeding for 1942 within the statutory meaning. We do not agree.

This problem was presented to the Court in *Spray Cotton Mills*, *supra*, and in reaching a solution there we set forth certain questions as follows:

* * * When, in this renegotiation proceeding, did the Secretary make a beginning, perform the first act, or take the first step toward refixing the contract price? When did he first perform an act which was adequate to bring in the contractor as a party to a proceeding which would lead to a determination by the Secretary respecting excessive profits?

We believe the facts here show that the Secretary first performed an act adequate to bring the contractor in as a party to the proceeding which ultimately led to a determination of excessive profits for the year 1942 when he wrote the letters to Spar on May 29, 1942, which are set forth in our findings, requesting detailed statements concerning the sales of wooden cargo booms, spars and fittings involved.

With respect to the argument of petitioners that the 1942 proceeding was not begun "within the time" provided by the act, it should be noted that section 403 (c) (6) of the Act of 1942 provides that no renegotiation proceedings shall be begun more than one year after the close of the fiscal year of the contractor or subcontractor within which completion or termination of the contract or subcontract, as determined by the Secretary, occurs. The contracts which Harney-Murphy and Spar entered into with Portland were completed in 1942, as shown in our findings. Within one year after the close of their respective fiscal years, July 31, 1942, for Harney-Murphy, and December 31, 1942, for Spar, there was a commencement of the proceeding in the statutory sense, as we have hereinabove pointed out.

This leaves for our consideration the problem of whether the 1943 renegotiation proceeding was begun within the period of limitations provided by the Renegotiation Act of 1943. Sections 403 (c) (1), (c) (5), and (c) (3), which are necessary for our discussion of this problem, are set forth in the margin.[4]

---

[4] [Sec. 403 (c)] (1) Whenever, in the opinion of the Board, the amounts received or accrued under contracts with the Departments and subcontracts may reflect excessive profits, the Board shall give to the contractor or subcontractor, as the case may be, reasonable notice of the time and place of a conference to be held with respect thereto. The mailing of such notice by registered mail to the contractor or subcontractor shall constitute the commencement of the renegotiation proceeding. * * *

* * * * * * *

(3) No proceeding to determine the amount of excessive profits shall be commenced more than one year after the close of the fiscal year in which such excessive profits were received or accrued, or more than one year after the statement required under paragraph (5) is filed with the Board, whichever is the later, and if such proceeding is not so commenced, then upon the expiration of one year following the close of such fiscal year, or one year following the date upon which such statement is so filed, whichever is the later, all liabilities of the contractor or subcontractor for excessive profits received or accrued during such fiscal year shall thereupon be discharged. * * *

* * * * * * *

The facts disclose that on May 29, 1944, Spar filed the financial statement which set forth such information as the War Contracts Price Adjustment Board prescribed by regulations in accordance with section 403 (c) (5) of the Renegotiation Act of 1943. In accordance with section 403 (c) (3) any renegotiation proceeding in respect of the fiscal year 1943 could not have been commenced more than one year "after the statement required under paragraph (5) is filed with the Board * * *." On May 12, 1945, the Maritime Commission Price Adjustment Board, the delegatee of War Contracts Price Adjustment Board, sent a registered letter to Spar which contained the statement "this notice, sent by registered mail, constitutes commencement of renegotiation proceedings in conformity with the provisions of subsection (c) (1) of the Renegotiation Act." It is thus apparent that the renegotiation proceedings herein involved were timely commenced for the fiscal year ended December 31, 1943, and that issue 1 should, therefore, be decided in favor of respondents.

*Issue 2.*—The petitioners also contend that:

In respect of 1942, the Court cannot determine any excess profits against either Spar Manufacturers or Harney-Murphy Supply Company for the reason that these separate legal entities were each independent subcontractors and the determination of excess profit of $154,000.00 does not profess to determine what part thereof is applicable to one or the other.

There can be no doubt that the contracts involved for the fiscal year 1942 were renegotiable, despite petitioners' argument to the contrary on reply brief, for final payment pursuant to such contracts was made after April 28, 1942. See section 403 (c) (6) of the Renegotiation Act of 1942.

Respondent points out, and correctly we think, that he did not determine the excessive profits of Spar and Harney-Murphy, but rather determined the excessive profits of the three individuals, Harney and the two Murphys, doing business as Spar Manufacturers and Harney-Murphy Supply Co. The order determining excessive profits reads as follows:

Pursuant to due authority a renegotiation proceeding was duly commenced with Maurice W. Harney, of Seattle, Washington, George E. Murphy, of Portland, Oregon, and Harry B. Murphy, of Boise, Idaho, partners, doing busi-

---

(5) (A) Every contractor and subcontractor who holds contracts or subcontracts, to which the provisions of this subsection are applicable, shall, in such form and detail as the Board may by regulations, prescribe, file with the Board on or before the first day of the fourth month following the close of the fiscal year (or if such fiscal year has closed on the date of the enactment of the Revenue Act of 1943, on or before the first day of the fourth month following the month in which such date of enactment falls), a financial statement setting forth such information as the Board may by regulations prescribe as necessary to carry out this section. In addition to the statement required under the preceding sentence, every such contractor or subcontractor shall, at such time or times and in such form and detail as the Board may by regulations prescribe, furnish the Board any information, records, or data which is determined by the Board to be necessary to carry out this section. * * *

ness under the firm name and style of SPAR MANUFACTURERS, and also doing business under the firm name and style of HARNEY-MURPHY SUPPLY COMPANY. * * *

We do not believe it was necessary for the respondent to have gone through the procedure of entering a separate determination against the several contractors involved. So far as the facts are concerned, the liability of the individuals for the fiscal year ended December 31, 1942, under the determination of the respondent, would have been the same no matter in what form issued.

Moreover, petitioners apparently never raised this objection at any time before this hearing. Indeed, it is apparent from the facts that they were the initiators of using the combined profits of Spar and Harney-Murphy for the purposes of this renegotiation proceeding. This is shown by a letter of Spar dated May 7, 1943, addressed to the United States Maritime Commission, which reads in part as follows:

Spar Manufacturers absorbed Harney-Murphy Supply Company as of July 31, 1942 since their business was of exactly the same nature and owned by the same proprietors. This is our reason for showing a combined percentage of profit for the two companies.

We therefore believe that their argument on this point is untenable.

*Issue 3.*—In their pleadings petitioners maintain that the Acts of 1942 and 1943 are unconstitutional as applied to them in this case. However, we believe the acts are constitutional under the facts of this case in accordance with the rationale of *Lichter* v. *United States*, 334 U. S. 742, and those cases of this and other courts which have followed it. See also *Stein Bros. Mfg. Co.*, 7 T. C. 863.

*Issue 4.*—The next question is whether petitioners' profits for the years involved were excessive and if so, to what extent.

"One of the important factors in determining whether or not profits are excessive is the amount of fixed assets and other capital risked and used in the renegotiable business." *Stein Bros. Mfg. Co., supra.* The individual petitioners' net worth as of December 31, 1941, was $14,-522.32; their net worth as of December 31, 1942, was $110,920.[5] During 1942 the petitioners' operation showed a profit of $250,970.82, a return of over 1,700 per cent on their capital investment; in 1943 their activities reflected a profit of $245,545.72, which represents a return of over 220 per cent of their net worth at the end of 1942. After renegotiation, the profits left undisturbed by the renegotiators of approximately $96,000 for 1942 and $75,500 for 1943, represented a return of 151.3 per cent and 68.1 per cent, respectively, for these years.

The petitioners took no substantial risks in connection with their operations during either year involved. As pointed out in our find-

---

[5] The figure for 1941 represents the combined net worth of Spar and Harney-Murphy, and the figure for the year 1942 represents the net worth of Spar.

ings, in 1942 petitioners' sales were $801,780.66 and costs were $550,-809.84, and their profits were $250,970.82. Their profits were 31.3 per cent of their sales and 45.5 per cent of their costs. During 1943 their sales were $766,530.06, and costs were $520,984.34, and their profits were $245,545.72. For that year the profits were 32 per cent of their sales and 47.1 per cent of their costs. Their costs could have been increased by 45 per cent and 47 per cent in 1942 and 1943, respectively, before they would have sustained any losses from their operations. It is thus apparent that petitioners had no substantial pricing risks during the years involved.

Moreover, when petitioners' inventories are compared with their profits, it is apparent that they had no inventory risks during the periods involved. Their inventory at the beginning of 1942 was only $2,450, at the beginning of 1943 it was $9,508, and at the end of 1943 it was only $5,630.

During 1942 and 1943 petitioners, doing business as Spar Manufacturers and Harney-Murphy Supply Co.[6] took no risk through conversion to wartime business since they performed the same type of operations as before entering upon the renegotiable business. It is true that they built a new plant and installed new equipment, but their plant and equipment only increased from a value of $2,851 at the beginning of 1942 to $41,008 at the beginning of 1943.

The above consideration, together with the fact that it is obvious from the facts that the volume of petitioners' gross income resulted more from the fortuitous factors of a wartime economy than anything else, lead us to believe that the determination of the respondent in each of the proceedings before us was eminently fair.

The petitioners' principal argument on the issue of whether or not there were any excessive profits is that they were faced with a serious reconversion problem when their war contracts were completed in 1944. It is difficult to follow their argument. As above stated, during the years before 1942 and 1943 the individual petitioners were in the same type of production as is involved here. After the war it is true that petitioners attempted to enter upon a new type of business, but we do not believe that Congress gave to the renegotiation acts any purpose of guaranteeing profits to contractors who, after completion of the renegotiable business, entered into lines of business completely foreign to any they carried on either during or before the war years.

Petitioners have pointed to various favorable factors in their record of production, such as important labor and time-saving processes, the fact that practically none of the products manufactured by them were rejected, and that they put forth "unusual effort for the purpose of fulfilling the contracts." We believe that the amount of profit allowed

---

[6] Harney-Murphy Supply Co. was dissolved as of July 31, 1942.

by the renegotiators contains an ample cushion to absorb all of the allowances for favorable things that may be said about the efficiency of petitioners' performance under the war contracts.

It is, therefore, our judgment, after giving careful consideration to all the evidence and to the contentions of counsel, that the profits for the years involved are excessive in the amounts as determined by the respondents.

Orders will be entered in accordance herewith.